## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **KRISTEN BRITNEY KENNAMER**, | ) | |
| | ) | |
| **Plaintiff** | ) | |
| | ) | |
| **v.** | ) | **Case No. 2:10-CV-0759-KOB** |
| | ) | |
| **MICHAEL J. ASTRUE**, | ) | |
| **Commissioner of the Social**, | ) | |
| **Security Administration** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION

## I. INTRODUCTION

On July 17, 2007, the claimant, Kristen Kennamer, filed an application for SSI benefits under Title XVI of the Social Security Act. (R. 105, 117). The claimant first alleged disability commencing on January 1, 1991 because of bipolar disorder and attention deficit hyperactivity disorder ("ADHD"). (R. 121). The Commissioner initially denied the claim on September 20, 2007. (R. 51, 56). The claimant filed a timely request for a hearing before an Administrative Law Judge, and the ALJ held a hearing on June 4, 2009. (R. 11). At the hearing, the claimant, through counsel, amended the alleged onset date of disability to July 17, 2007, the protective filing date of her application. (R. 26). Claimant's grandmother and a vocational expert both appeared and offered testimony at the hearing. (R. 40-45). In a decision dated August 26, 2009, the ALJ found that the claimant was not disabled as defined by the Social Security Act and, thus, was ineligible for SSI. (R. 21). On January 29, 2010, the Appeals Council denied the claimant's request for review; consequently, the ALJ's decision became the final decision of the Commissioner of the Social Security Administration. (R.

1). The claimant has exhausted her administrative remedies, and this court has jurisdiction pursuant to 42 U.S.C. §§ 405(g) and 1631(c)(3). For the reasons stated below, this court affirms the decision of the Commissioner.

## II. ISSUES PRESENTED

In this appeal, the claimant broadly alleges that the ALJ's Residual Functional Capacity findings are inconsistent with the medical evidence of record.  More specifically, she raises the following issues:

1. Did the ALJ have sufficient evidence to assess the claimant's mental impairment because no Psychiatric Review Technique form ("PRTF") was on file for the claimant?

2. Did the ALJ err in discounting the opinion of Dr. Callahan, the treating psychiatrist?

3. Did the ALJ properly consider the claimant's obesity in making his RFC findings?

4. Did the ALJ err in considering claimant's part-time position as support for his finding that claimant should be capable of performing work on a full-time basis?

## III. STANDARD OF REVIEW

The standard for reviewing the Commissioner's decision is limited. This court must affirm the Commissioner's decision if the Commissioner applied the correct legal standards and if the factual conclusions are supported by substantial evidence. *See* 42 U.S.C. § 405(g); *Graham v. Apfel,* 129 F.3d 1420, 1422 (11th Cir. 1997); *Walker v. Bowen,* 826 F.2d 996, 999 (11th Cir. 1987).

"No . . . presumption of validity attaches to the [Commissioner's] legal conclusions, including determination of the proper standards to be applied in evaluating claims." *Walker,* 826 F.2d at 999. This court does not review the Commissioner's factual determinations *de novo*. The

court will affirm those factual determinations that are supported by substantial evidence. "Substantial evidence" is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401 (1971).

The court must "scrutinize the record in its entirety to determine the reasonableness of the [Commissioner]'s factual findings." *Walker,* 826 F.2d at 999. A reviewing court must not look only to those parts of the record that support the decision of the ALJ, but also must view the record in its entirety and take account of evidence that detracts from the evidence relied on by the ALJ. *Hillsman v. Bowen*, 804 F.2d 1179, 1180 (11th Cir. 1986).

## IV. LEGAL STANDARD

Under 42 U.S.C. §423(d)(1)(A), a person is entitled to disability benefits when the person cannot "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). To make this determination, the Commissioner employs a five-step, sequential evaluation process:

> (1) Is the person presently unemployed?
> (2) Is the person's impairment severe?
> (3) Does the person's impairment meet or equal one of the specific impairments set forth in 20 C.F.R. pt. 404, subpt. P, app. 1?
> (4) Is the person unable to perform his or her former occupation?
> (5) Is the person unable to perform any other work within the economy?
>
> An affirmative answer to any of the above questions leads either to the next question, or, on steps three and five, to a finding of disability. A negative answer to any question, other than step three, leads to a determination of "not disabled."

*McDaniel v. Bowen,* 800 F.2d 1026, 1030 (11th Cir. 1986); 20 C.F.R §§ 404.1520, 416.920.

When addressing a mental health diagnosis, the Social Security Regulations require the ALJ to complete a PRTF, append it to the decision, or incorporate its mode of analysis into his findings and conclusions. *Moore v. Barnhart,* 405 F.3d 1208, 1214 (11th Cir. 2005). This technique requires separate evaluations on a four-point scale of how the claimant's mental impairment impacts four functional areas: activities of daily living, social functioning, concentration, persistence or pace, and episodes of decompensation. *Id.* at 1213-1214 *(*citing 20 C.F.R. §404.1520a-(c)(3-4)).

When an ALJ evaluates medical evidence, "the testimony of a *treating* physician must be given substantial or considerable weight unless 'good cause' is shown to the contrary. A *treating* physician's report may be discounted when it is not accompanied by objective medical evidence or is wholly conclusory." *Crawford v. Commissioner*, 363 F.3d 1155, 1159 (emphasis added) (citation and internal quotation omitted).

When considering obesity, the ALJ must consider the cumulative effects of obesity on the claimant's ability to perform work-related tasks. *See* 20 C.F.R. pt. 404 subpt. P, app. 1 § 1.00Q. Social Security Regulation (SSR) 02-1p concerns the evaluation of obesity. It provides that obesity may limit exertional and postural functions and that an assessment should be made of the effect obesity has upon the individual's ability to perform routine movement and necessary physical activity within the work environment. RFC assessments must consider an individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis. SSR 02-1p.

## V. FACTS

The claimant, Kristen Kennamer, was born on October 5, 1987 and previously filed a

4

claim for Supplemental Security Income ("SSI") as a child on July 31, 2003. Because of disability resulting from ADHD, claimant received benefits from September 1, 2003 through October 2006, when those benefits ceased after an Age 18 Redetermination. (R. 11, 32). She has a GED and was twenty-one years old at the time of the administrative hearing for the current claim. (R. 26-27, 117, 125). Her past work experience includes part-time employment as a cashier. (R. 28-29, 42, 114). The claimant initially alleged disability because of bipolar disorder and ADHD. At the hearing before the ALJ, claimant argued that she was disabled based on mental impairments, including anxiety, possible bipolar disorder, and headaches. (R. 26).

*Background and Medical History*

Claimant's biological parents divorced when she was an infant. (R. 150) Claimant lived with her grandmother from the time she was sixteen months old, and her grandmother adopted her at age two. (R. 15, 40, 152). Claimant testified that she began receiving treatment for ADHD when she was four years old, and she reported having taken Ritalin on and off for approximately ten years until October 2001, when she switched to Concerta. (R. 15, 37, 150). In April 2002, because of claimant's defiance, disrespect of authority, verbal and physical aggression, poor academic performance, poor anger management, alcohol and marijuana abuse, poor self-esteem, and general antisocial behavior, her grandmother sent claimant, then age fourteen, to Three Springs, a residential treatment facility for troubled youth, where claimant remained until November 2004. (R. 40-41, 147, 158-63). Claimant's admitting diagnoses at Three Springs included Oppositional Defiance Disorder, ADHD by history, Parent-Child Relational Problem, Alcohol Abuse, and Cannabis Abuse. (R. 160).

A psychological evaluation of claimant on June 13, 2002 by Dr. Barbara Jacobs, a

5

licensed psychologist at Three Springs, noted a history, provided by claimant's aunt, of extensive substance abuse by both of claimant's parents. Claimant's father was in prison during much of her childhood, and her mother remarried and had other children.  The mother's remarriage reportedly resulted in less communication between claimant and her mother. Claimant's paternal grandfather died in the spring of 2001, and her family reported that claimant's behavior worsened thereafter. According to her aunt, claimant had become more physically aggressive and out of control in the year before admission to Three Springs, including kicking holes in walls, throwing things, hitting and punching others, slamming doors off hinges, and generally disobeying rules. Claimant reportedly hit her grandmother during this period, causing bruises. (R. 152-154).

Dr. Jacobs referenced information from Ms. Aston, a Licensed Clinical Social Worker at Grayson & Associates, that showed claimant received treatment at that office from June 2000 with only minimal improvement. Ms. Aston recommended residential treatment.  Dr. Jacobs referred to a letter, dated February 15, 2002, from Dr. Don Paoletti, a psychiatrist at Grayson & Associates, which stated that he previously diagnosed claimant with depressive disorder (not otherwise specified), disruptive behavior disorder (not otherwise specified), and ADHD, for which he prescribed various medication trials culminating in Concerta. He noted claimant had a strong narcissistic sense of entitlement, and he also recommended residential treatment.  Dr. Jacobs administered a Wechsler Intelligence Test for Children, which determined that claimant's full scale IQ score fell within the average range of measured intelligence. (R. 152-55).

Claimant graduated from the Three Springs treatment program and was discharged on November 20, 2004.  Her discharge summary reported that claimant "displayed significant reduction in defiant behaviors towards adults[,]" that she "began to consistently interact with

adults in a socially acceptable, respectful, and cooperative manner[,]" and that she "demonstrated consistent honesty, compliance with rules, sensitivity to the rights and feeling of others and acceptance of responsibility for her actions." (R. 147). The report noted that claimant would need to continue working on her tendency to seek attention in negative matters. The discharge recommendations directed claimant to return to school immediately and continue individual and family counseling. (R. 147-49). On December 3, 2004, the Jefferson County Board of Education evaluated claimant because of behavior concerns and to determine her functional level. Claimant scored in the average level of intelligence on the Stanford-Binet Intelligence Scales. (R. 172).

Claimant did not finish high school, but subsequently received her GED. She started college in August 2007, but withdrew within a month. (R. 27,196). Claimant went to jail in 2007 for domestic violence against her grandmother, but the judge suspended her sentence and ordered her to find a job and attend therapy. (R. 31, 41). Claimant worked part-time as a cashier at Dollar General, Wal-Mart, and Target at various points between 2007 and May of 2009, with the Wal-Mart and Target positions being assumed after claimant's alleged onset of disability of July 17, 2007. (R. 27-31, 38, 101-02, 228).

Medical records from March 7, 2001 through June 25, 2007 show that claimant appeared at the office of her primary care provider, Dr. Donald R. Ashley, with various complaints, including headaches, an insect bite, sleeplessness, left leg numbness, a cyst on the left inner thigh, a hearing deficit, sore throat, cold, and cough. On June 25, 2007, he treated claimant for multiple contusions from an assault and listed her height at 65 inches and weight at 311.5 pounds. (R. 181-96).

On July 30, 2007, the Alabama Department of Rehabilitation services informed claimant

that she was not eligible for transition services based on her most recent medical records.  The

letter to claimant stated, "The documentation obtained make [sic] it necessary that the

department delay further action until you can become more stable in your activities of daily

living." (R. 236). On August 25, 2007, claimant's grandmother filled out a "Third Party Daily

Activities Questionnaire" for the Disability Determination Service, wherein she stated that

claimant has difficulty in getting along with friends, family or others, cannot concentrate enough

to finish a job or schoolwork, cannot manage a checkbook, kicks walls, throws things, and has

trouble following orders. (R. 127-30).

On September 19, 2007, Dr. Robert Estock, a state psychological consultant, determined

that insufficient evidence existed in the record to complete a Psychiatric Review Technique. (R.

201). Dr. Estock had unsuccessfully attempted to contact claimant and the "third party"

numerous times over a month long period.  Because claimant had not responded to his request

for additional information necessary for a productive determination by September 19, 2007, Dr.

Estock made his determination based on the insufficient information in the file. (R. 213)

Consultant's notes on the form indicated that claimant had prescriptions for Abilify and Concerta

from Frank Kay Clinic. ( R. 213).

On March 31, 2008, claimant sought treatment from  psychologist  Lisa O. Hennick,

Ph.D.  Records indicate that claimant presented at her office alleging feelings of depression and

moodiness. Dr. Hennick noted that claimant had received therapy since the age of four; was

previously diagnosed with ADHD; last saw a psychiatrist, Dr. Rita Patton, in January of 2007;

reported dealing with grief over the death of her father in 2007 because of liver damage; and had

last received prescriptions for Concerta and Abilify.  Dr. Hennick referred claimant to a

psychiatrist at Grayson & Associates, Dr. Karen Callahan.  On May 5, 2008, a record from Dr. Hennick indicates claimant missed a scheduled appointment with Dr. Callahan and had instead chosen to see a therapist covered by claimant's insurance.  (R. 233, 234).

On June 10, 2008, claimant met with a physician at Grayson & Associates (presumably Dr. Callahan, pursuant to the referral from Dr. Hennick).[1]  Treatment notes indicate that claimant had not sought mental health treatment since she left Three Springs in 2004. Claimant stated that she did not want to admit her issues and that she did not think her medications helped, so she had quit taking them. She indicated that smoking marijuana was the only time she felt in control.  She described her various symptoms, including suicidal thoughts, sleeplessness, and hitting her head against a wall during moments of anger.  Dr. Callahan noted possible bipolar disorder and prescribed Lamictal and Wellbutrin. (R. 241-42).

The claimant returned to Grayson & Associates on July 10, 2008. (R. 240).[2]  Notes indicate that claimant reported taking Lamictal for two weeks before quitting, claiming it caused

---

[1]The ALJ identifies the notes listed in Exhibit 13F as those of Dr. Lisa Hennick, but based on handwriting and signature comparisons, they instead seem to be the notes of Dr. Karen Callahan.  As such, they are not clearly identified. However, the court accepts that the notes of June 10, July 10, and August 12, 2008 from Grayson & Associates are likely those of Dr. Callahan.

[2] As will be discussed below, the ALJ references treatment by Dr. Hennick on January 10, 2008. On review, however, the court finds that no such record exists. The date, particularly the month, of the notes on file here did not copy clearly so that the "7" (July) on the copy appears to be a "1" (January). (R. 240). Based on the dates of treatment notes adjacent to this record, handwriting and signature comparison, and continuity in the discussion of Lamictal, the court concludes that a physician at Grayson & Associates (presumably Dr. Callahan) made notes on July 10, 2008 of her session with claimant. Those notes were attached to Dr. Hennick's records as part of Exhibit 13.  The ALJ likely mistakenly believed this July 10, 2008 record was from January 10, 2008. (R. 16).

nausea and heart racing.  Claimant stated she was very moody and stressed.  Her grandmother

stated claimant's medication compliance had always been an issue. Dr. Callahan directed

claimant to continue taking Lamictal. (R. 240).

On August 11, 2008, Dr. Callahan completed a "Supplemental Mental Questionnaire"

form, prepared by claimant's law firm.  She estimated that claimant suffered from a marked

restriction of daily living activities; extreme difficulty in maintaining social functioning; marked

deficiencies of concentration, persistence, or pace, resulting in failure to complete tasks in a

timely manner; extreme impairment of ability to respond to customary work pressures; marked

limitations in understanding, carrying out, and remembering instructions, performing repetitive

tasks, and responding appropriately to supervision in a work setting; and moderate limitations in

responding to co-workers and performing simple tasks in a work setting.  She indicated that these

limitations have lasted or could be expected to last twelve months or longer and that the levels of

severity apply without consideration of substance abuse, but noted that no psychological

evaluation had been obtained. (R. 216).

Claimant again saw Dr. Callahan on August 12, 2008.  Claimant reported taking Lamictal

again, but had stopped because it made her feel angrier and more irritable.  Claimant denied

using marijuana.  Dr. Callahan noted a heightened state of anxiety and prescribed Abilify and

Concerta. (R. 239).

On August 7, 2008, claimant visited a neurologist, Dr. Stephen Rudd, by referral of her

primary care provider, Dr. Donald Ashley, because of her headaches. Claimant reported a history

of headaches dating back to childhood. She stated that she took over-the-counter medications to

control them, but that these had been  ineffective over the previous weeks. Claimant stated the

headaches came on during stress, particularly with mood swings related to her diagnosis of bipolar disorder.  She indicated that the headaches occurred as often as once every few days, and a light tap on the head or sudden movement of the head could provoke them.  Claimant admitted using tobacco and alcohol.  Dr. Rudd examined claimant and found nothing mentally or physically abnormal, except that claimant was notably obese. He diagnosed tension-type headaches, scheduled an MRI, and prescribed Midrin as needed with Naproxen. (R. 253-54). On August 18, 2008, claimant returned to Dr. Rudd.  She stated that the "medicine has worked really well."  Dr. Rudd relayed that her MRI studies were all normal and scheduled her to return in three months. (R. 245-47, 251).

From October 7, 2008 to February 14, 2009, claimant sought intermittent treatment at Baptist Health Center and American Family Care for various complaints, including headaches, ear pain, toe infection, nausea, weight gain, and sleeplessness. (R. 217-26).

Claimant returned again to Dr. Rudd on June 5, 2009, complaining that her headaches had returned, for which she had sought emergency room treatment. Dr. Rudd noted that she had begun taking Geodon and Celexa. He described the headaches as a migraine cluster and prescribed Indocin and Lortab. (R. 248-49).

*The ALJ Hearing*

After the Commissioner denied the claimant's request for supplemental security income on September 20, 2007, the claimant requested and received a hearing before an ALJ. (R. 57, 70). At the hearing on June 4, 2009, claimant's counsel introduced Ms. Janet Kennamer, claimant's grandmother, as a witness. He requested that the ALJ allow him time to update the record with medical records from Grayson & Associates, where claimant received mental health treatment, to

11

support a residual functional assessment/supplemental questionnaire form submitted by Dr.

Callahan, and the ALJ granted a twenty day period in which to submit the records. Claimant's

counsel moved to amend the alleged onset date of disability to July 17, 2007, and the ALJ

agreed.  Claimant's counsel then alleged her disability based on mental impairments, including

anxiety, the possibility of bipolar disorder, and significant headaches. Claimant later submitted

that she had suffered from ADHD since the age of four. (R. 25-26, 37).

The ALJ then questioned claimant regarding her age, education, and work experience.

Claimant testified that she was twenty-one years old, had received her GED, and had worked,

after her alleged onset date of disability, at Target for approximately seven months, from October

2008 until the end of May 2009. (R. 26-27,228).  She testified that she worked from fifteen to

thirty hours per week as a cashier, and she never worked any full-time hours, despite requesting

to do so. (R. 28). Claimant's counsel argued that this work did not amount to substantial gainful

employment. (R. 39).  Claimant testified that she went to jail after being arrested for domestic

violence in 2007. Although she was convicted, the judge suspended her sentence and ordered her

to go to therapy and get a job. Thereafter, claimant worked at Dollar General and Wal-Mart as a

cashier, and she stated she was fired from those positions, as well as from Target, because of

absences resulting from her headaches. (R. 29-31, 36-38). Although claimant testified that

Walmart fired her on June 28, 2007, records indicate she worked at Dollar General during the

second quarter of 2007, and at Wal-mart in the fourth quarter of 2007 and second quarter of

2008; claimant's counsel later clarified this testimony (R. 29, 38, 101-102).

The ALJ then asked which doctor treated her headaches. Claimant testified that she saw

Dr. Sharon Gray during the week,  went to American Family Care on the weekend, and saw a

neurologist, Dr. Steven Rudd, at the Alabama Neurological Institute. The ALJ asked claimant about her previous period of disability, and claimant testified that it stopped when she turned eighteen. (R. 31-32).

Next, the ALJ asked claimant how much she weighed, and the claimant answered that she weighed 340 pounds. The ALJ asked if claimant had any trouble using her fingers and thumbs, and the claimant responded that she did not. Claimant testified that she had a driver's license and drove three to four times per week to her biological mother's house, about twenty-five miles away, where she spent approximately four hours per day visiting with her mother, younger brother, and younger sister. The ALJ asked if she ever went shopping at the store, and the claimant testified that she had difficulty shopping because she went into an emotional panic and sweated. She testified that her emotional and social anxiety problems existed in any public place and that she took medication for this condition, which she stated did not help much. She stated that she no longer saw Dr. Callahan, but rather saw Dr. Adrian Thomas and a therapist, Dalton Blakenship, who were in the same group as Dr. Callahan. (R. 32-35).

The ALJ asked how often claimant's headaches occurred, and she stated that they occurred no less than three times per week and sometimes everyday. Claimant stated that she had these headaches for a long time in her life, had taken several medications, and had even received shots at the emergency room for her headaches, but nothing worked.  She claimed they were hereditary from her mother's side of the family. The ALJ asked claimant if she had any other health problems that might restrict her from working full time, and claimant responded that she had scoliosis and did not think she could pick up objects over twenty pounds. (R. 35-36). Claimant then summarized the problems she encountered in a work environment by stating that

she wanted to work, but that she had a hard time getting along with people or connecting in relationships, had frequent headaches, and suffered from stress and anxiety such that she did not want to be around anyone else. (R. 38-39).

Next, claimant left the room and her counsel interviewed her grandmother, Janet Kennamer. Mrs. Kennamer stated that claimant came to live with her at sixteen months old and had problems all through the years in school and social settings. Mrs. Kennemer stated that her husband died in 2000 (though the record elsewhere states 2001) and that claimant "kind of went into a tailspin" afterwards, causing claimant to be suspended and/or expelled from school (R. 40-41, 152). Mrs. Kennamer testified that she then sent claimant to Three Springs, a school for troubled children, but said she did not know how much it helped claimant. She further stated, "I think . . . Kristen has some type of brain damage somewhere because I think she tries and then she just shoots herself in the foot before she ever proves herself . . . ." ( R. 41). She stated that claimant had attacked her with a bottle, resulting in claimant's domestic violence conviction, and that she was claimant's only support. She testified that claimant's father died in 2007, that her mother had nothing to do with claimant until recently, when claimant began to drive, and that she believed abandonment to be part of claimant's problem. Lastly, she stated that she believed claimant's headaches surely impacted her ability to work, and said, "I really believe in her mind she is sick and not able to go to work." (R. 41-42).

The claimant returned, and the ALJ then interviewed Mr. Dennis O'Connor, a vocational expert. Mr. O'Connor testified that claimant's past work experience as a cashier in a number of retail situations, designated as "cashier II" in the Dictionary of Occupational Titles (DOT), fell into the light exertional and unskilled category. (R. 42). The ALJ then asked the VE to consider

14

a hypothetical worker of claimant's age and education, who "is able to work in situations that do not require constant intensive interaction with the public, co-workers or supervisors." The ALJ clarified that the person's contact capacity would be brief and superficial, and that "[t]his person can function in a small group such as a family type unit, but should not be in charge of a customer service complaint department or should . . . not be counseling people about personal issues or things that might require dealing with that form of involvement." (R. 43). The ALJ asked the VE if he found occupations within claimant's past work history that would allow for that hypothetical functional capacity, and the VE responded that he did not.

The ALJ asked how a cashier is distinguishable from the example he gave the VE, and the VE stated that the "cumulative effective of constantly meeting and greeting new people would make that type of work not appropriate for such a hypothetical individual." The VE stated that "because of the constant contact with others, it would almost be as if such a person were dealing with a larger group." ( R. 43). The ALJ then asked the VE if occupations existed in the national economy that fell within the hypothetical, and the VE responded affirmatively. The VE stated that he would look toward those occupations requiring a worker at a workstation and not regularly dealing with the public or other co-workers or supervisors, such as a bench type assembly job. (R. 43-44). The VE suggested the hypothetical individual would be capable of performing the DOT listings of "small products assembler II," an unskilled and light exertional position, approximately 125,000 of  which existed in the national economy and 3,500 or so existed in Alabama; a "sorter," an unskilled and light exertional position, approximately 18,000 of which existed in the national economy and 750 or so existed in Alabama; or a "trimmer," an unskilled and light exertional position, approximately 16,000 of which existed in the national

economy and 200 or so existed in Alabama.  The ALJ then asked the VE whether, if that same

hypothetical worker could not complete an eight hour work day or a full time equivalent work

week on a regular and continuing basis, such a person could perform competitive jobs.  The VE

answered in the negative. (R. 44-45).

Lastly, claimant's counsel questioned the VE regarding the Supplemental Mental

Questionnaire (also referred to as the RFC) completed by Dr. Callahan.  He asked the VE what

effect, if the ALJ found the rankings and limitations outlined on that form to be supported by the

medical records, such limitations would have on claimant's ability to sustain competitive

activity, including in those positions the VE had mentioned.  The VE responded that the

difficulties shown on the form are marked and extreme and that he would have no jobs to suggest

for such a hypothetical individual.

The ALJ noted that claimant's counsel's law firm created the  Supplemental Mental

Questionnaire that Dr. Callahan completed, and the ALJ asked claimant's counsel about a

question on the form seeming to indicate that Dr. Callahan performed no psychological

evaluation prior to filling out the form.  Claimant's counsel responded that records would show

claimant's treatment by Dr. Callahan, and the ALJ concluded the hearing by leaving the record

open for twenty days to receive records from Dr. Callahan at Grayson & Associates and the

neurologist, Dr. Rudd. (R. 46-47).  The record does not reflect that claimant submitted the

promised records within the twenty day period.

*The ALJ's Decision*

On August 26, 2009, the ALJ issued a decision finding the claimant was not disabled

under the Social Security Act. (R. 21). First, the ALJ found that the claimant had not engaged in

16

substantial gainful activity since the alleged onset of her disability. (R. 13). Next, the ALJ found that the claimant's ADHD, migraine cluster headaches, obesity, and bipolar disorder qualified as severe impairments; he concluded, however, that these impairments did not singly or in combination manifest the specific signs and diagnostic findings required by the Listing of Impairments. (R. 14).

In making the step three finding under the Listing of Impairments, the ALJ analyzed claimant's mental impairments, singly and in combination, under the "paragraph B" criteria of listing 12.04.  First, the ALJ found that claimant had  mild restriction in activities of daily living. He noted that she could care for her personal needs, drive, maintain a household, and independently structure and execute a daily routine. Second, he found claimant had moderate difficulties in social functioning. He observed that she had difficulty getting along with peers and authority when she was younger, but that claimant's symptoms improved after her stay at Three Springs residential facility. He further reasoned that when claimant took her medications, her symptoms were manageable, but that she has difficulty getting along with others when noncompliant with treatment. Third, the ALJ concluded that claimant had mild difficulties in concentration, persistence, or pace. He stated that little evidence existed in the record to support limitation in this area. Finally, the ALJ observed that claimant experienced no episodes of decompensation of extended duration during the relevant period and emphasized that claimant did not require additional hospitalizations since her time at Three Springs in 2004. (R. 14).

Because he found that claimant's impairments caused no combination of two marked restrictions, or of a marked restriction and repeated episodes of decompensation of extended duration, the ALJ concluded that these impairments did not satisfy the "paragraph B" criteria.

17

The ALJ then considered the "paragraph C" criteria, but concluded that the evidence did not establish the presence of those factors.  He noted that these initial findings of claimant's limitations were used to rate the severity of mental impairments at steps two and three of the evaluation process and were not a residual functional capacity assessment; he stated that he must perform a more detailed assessment and itemization of the broad categories found in "paragraph B" to ascertain claimant's RFC at steps four and five. (R. 14-15).

The ALJ proceeded to recount the testimony and evidence in the record as set forth above, with some discrepancies. For instance, he stated that claimant moved in with her grandmother at six months old, not sixteen months; that claimant began college in August 2008, not 2007; that her grandmother testified that claimant's headaches are a result of not being able to work, rather than a cause; and that Dr. Ashley was a neurologist who examined claimant, when in fact, Dr. Steven Rudd was the neurologist at the Alabama Neurological Institute who examined claimant on referral from Dr. Ashley. (R. 15-17). Additionally, the ALJ stated that treatment records of Dr. Lisa Hennick, claimant's psychologist, covered the period January 10, 2008 through May 5, 2008. (R. 16). However, the record shows that claimant saw Dr. Hennick on March 31, 2008 and May 5, 2008. (R. 233-34).  As previously discussed, the record shows that claimant saw a pychiatrist at Grayson & Associates, presumably Dr. Callahan, on June 10, July 10, and August 12, 2008. (R. 239-42).  No January 10, 2008 appointment with Dr. Hennick appears in the record, and the ALJ seems to have confused this appointment with the July 10, 2008 appointment. (R. 16). The ALJ noted that although claimant's counsel had over two months post-hearing to submit additional treatment records from Dr. Callahan, he failed to do so.  (R. 17).

Next, the ALJ concluded, "After careful consideration of the entire record, I find the claimant has the residual functional capacity to perform a full range of work at all exertional levels[,] but with the following nonexertional limitations: the claimant can function with brief and superficial contacts with the public, co-workers, and supervisors." He further found that "claimant's medically determined impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's and her grandmother's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment." (R. 18).

To support his conclusions, the ALJ stated that "[n]o examining or nonexamining physician supports disability in this case." He stated that although claimant's treating psychiatrist completed a form opining that claimant could not perform mental work-related activities, "it is important to note that claimant did not seek any mental health treatment between 2004 and 2007." He stated that claimant first presented for treatment at Dr. Callahan's group in 2008, only received minimal treatment there, and that her grandmother noted claimant's medication compliance had always been an issue. He referenced claimant's alcohol and drug use as complicating claimant's treatment. He stated that claimant's counsel did not provide additional medical records after the hearing as allowed, and that the most recent treatment record for his review was dated August 12, 2008. The ALJ emphasized that August 12, 2008 was one day before Dr. Callahan completed her questionnaire; however, the treatment record was for the day after Dr. Callahan completed the questionnaire. The questionnaire was dated August 11, 2008. He then stated, "Because Dr. Callahan's assessment is not consistent with the objective medical evidence in this case, I have afforded it little evidentiary weight." (R. 18-19).

19

The ALJ went on to state that "the record clearly shows and both Ms. Kennamer and her grandmother have reported that she has gone long periods of time without receiving any medical treatment and that she does not take her medication as prescribed, respectively." He stated that when claimant "was at Three Springs, underwent counseling, and took her medications as prescribed, she experienced significant improvement in her psychological symptoms."  As to claimant's daily activities, the ALJ observed that "claimant has admitted to driving to her mother's home 3 to 4 times a week, watching television, visiting with family members, caring for personal needs, and living on her own. Moreover, the fact that claimant worked on a part-time basis (up to 30 hours a week) after the alleged onset date, shows that she has been capable of performing some type of work activity since the alleged onset date and has not been totally disabled as she has alleged." (R. 19).

The ALJ stated that he did not find the "Third Party Daily Activities Questionnaire by claimant's grandmother, in which she stated claimant had difficulties getting along with others, persuasive. He referred to the discharge report from Three Springs treatment facility, which indicated that claimant got along with others and accepted responsibility for her actions.  The ALJ noted that claimant may have difficulty getting along with others and completing tasks when noncompliant with her medications or when she goes long periods without seeking medical treatment, but that "it is clear she is capable of functioning fairly well when she takes her medications as prescribed." Thus, he afforded little weight to the report. (R. 19).

Next, the ALJ stated, "As for the opinion evidence, I reject the conclusion of the state agency psychological consulting who . . . found insufficient evidence to assess the claimant's mental impairment. Based on the current evidence of record, I find there is ample evidence to

assess her mental condition." He stated that while he found the claimant had ADHD and bipolar disorder, he did not find those conditions severe when considered alone or in combination with her other impairments. He found that claimant was capable of performing within the residual functional capacity he had determined. In concluding the list of reasons for his RFC determination, the ALJ stated, "Obesity does not obviously impact the claimant's daily activities[,] and no physician has determined that she is unable to sustain physical exertion due to this impairment." ( R. 19).

The ALJ then concluded that, based on the testimony of the VE, claimant was unable to perform any past relevant work. He then concluded that based on claimant's age, education, work experience, and RFC, jobs existed in significant numbers in the national economy that claimant could perform. He noted that claimant's ability to perform work had been compromised by non-exertional limitations, but he noted that the VE testified that an individual with claimant's age, education, work experience, and RFC could perform assembler, sorter, or trimmer positions, which existed in significant numbers such that claimant could make a successful adjustment to other work. Thus, the ALJ concluded claimant was not disabled under the Social Security Act. (R. 19-21).

The Appeals Council denied claimant's request for review. Claimant has exhausted her administrative remedies and appeals from the final decision of the Commissioner under 42 U.S.C. § 1383(c)(3).

## VI. DISCUSSION

### A. The ALJ had sufficient information to assess the claimant's mental impairment even in the absence of a Psychiatric Review Technique Form (PRTF) on record.

Claimant asserts that the ALJ erred in assessing her mental impairment because the ALJ

21

rejected the opinion evidence of state psychological consultant, Dr. Robert Estock, that insufficient evidence existed to assess claimant's mental impairment.  Claimant further asserts that the ALJ should have ordered a consultative evaluation to determine claimant's mental condition.  The Government responds that the ALJ had sufficient information and properly incorporated this detailed assessment in lieu of a PRTF.

In the Eleventh Circuit, where a claimant has presented a colorable claim of mental impairment, the Social Security Regulations require the ALJ to complete a PRTF, append it to the decision, or incorporate its mode of analysis into his findings and conclusions.  *Moore v. Barnhart,* 405 F.3d 1208, 1214 (11th Cir. 2005).  This technique requires separate evaluations on a four-point scale of how the claimant's mental impairment impacts four functional areas: activities of daily living, social functioning, concentration, persistence or pace, and episodes of decompensation.  *Id.* at 1213-1214 *(*citing 20 C.F.R. §404.1520a-(c)(3-4)).

The ALJ rejected the conclusion of the state agency psychological consultant, Dr. Estock, who found insufficient evidence to assess the claimant's mental impairment on September 19, 2007 because he was unable to contact either claimant or a third party for over a month. (R. 201-214).  However, in August 2009, after the claimant sought treatment from at least two physicians and answered questions regarding her daily activities, the ALJ concluded that ample evidence existed to assess the mental condition of the claimant and to determine that the claimant's conditions of ADHD and bipolar disorder are not "severe" when considered singly or in combination with her other impairments. (R. 19).  In making this determination, the ALJ had access to the claimant's treatment records from Grayson & Associates, dating from March 2008 to August 2008, to claimant's treatment records from neurologist Dr. Stephen Rudd, dating from

August 2008 to June 2009, and to information provided directly by the claimant at the hearing concerning her daily activities.  The ALJ outlined his conclusions in lieu of a PRTF  in the Hearing Decision:  the claimant has mild restriction in activities of daily living, moderate difficulty in social functioning, mild difficulties with regard to concentration, persistence, and pace, and no episodes of decompensation.  (R. 14).  The ALJ went on to give detailed assessments by itemizing various functions contained in each broad category. (R. 14-19).

The court finds that the ALJ had sufficient information to assess the claimant's mental impairment because the ALJ had access to numerous treatment records and the testimony of the claimant concerning her daily activities, both of which were previously unavailable to Dr. Estock.  The court also finds that the ALJ properly incorporated the PRTF mode of analysis into his detailed findings and conclusions**.**  Therefore, the court finds that substantial evidence supports the ALJ's assessment of claimant's mental health impairment.

**B. The ALJ properly discounted the opinion of Dr. Callahan.**

Claimant next asserts that the ALJ erred in discounting the opinion of Dr. Callahan, claimant's treating psychiatrist at Grayson & Associates.  The Government responds that the ALJ had good cause to discount  Dr. Callahan's opinion because that opinion was wholly conclusory, not supported by objective medical evidence, and inconsistent with the objective medical evdience of record.

The basic rule of the Eleventh Circuit is that "the opinion of a treating physician is entitled to substantial weight unless good cause exists for not heeding the treating physician's diagnosis."  *Crawford v. Commissioner,* 363 F.3d 1155, 1159 (11th Cir. 2004); *see also Edwards v. Sullivan*, 937 F.2d 580, 583 (11th Cir. 1991).  The Commissioner also demonstrates a similar

23

preference for the opinion of treating physicians:

> Generally we give more weight to opinion from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from objective medical findings alone or from reports of individual examinations, such as consultive examinations or brief hospitalization.

*Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997)(citing 20 C.F.R. § 404.1527(d)(2)).

However, the ALJ may discount a treating physician's opinion or report when it is not accompanied by objective medical evidence or is wholly conclusory. *Crawford v. Commissioner*, 363 F.3d at 1159*; see also Edwards*, 937 F.2d at 583. When discounting the opinion of a treating physician, the ALJ must clearly articulate his reasons. *Phillips v. Barnhardt*, 357 F.3d 1232, 1241 (11th Cir. 2004).

The ALJ discounted the opinion of Dr. Callahan, the claimant's treating psychiatrist at Grayson & Associates, and clearly articulated his reasons for doing so. (R. 17-19).   The claimant had two appointments with Dr. Callahan between June 2008 and August 11, 2008.  On August 11, 2008, Dr. Callahan completed a Supplemental Mental Questionnaire, where she opined that the claimant had marked restriction in maintaining activities of daily living and in concentration, persistence, and pace and that the claimant had extreme limitation in maintaining social functioning and responding to customary work pressures.  As the ALJ specifically pointed out in his opinion, Dr. Callahan did not make any comments as to *why* she came to those conclusions nor did she attach medical treatment records supporting her opinions.  At the hearing, counsel for the claimant requested additional time to obtain and submit mental health treatment records from Dr. Callahan to support the Supplemental Mental Questionnaire, and the ALJ gave the claimant twenty days to produce them. (R. 25).

However, the claimant did not submit any additional records to the ALJ during the two months following the hearing or at any time prior to this appeal. (R. 4, 17).  In fact, the only treatment records from Grayson & Associates were four treatment records spanning from the end of March to August 2008: March 31, 2008 notes taken by psychologist, Lisa O. Hennick, Ph.D., describing claimant's alleged  feelings of depression and moodiness,  and the three records, presumably from Dr. Callahan, dated June, July and August 2008 which merely quote claimant's *own* characterizations of her problems and list medication prescriptions.  One treatment note does give a *possible* diagnosis of bipolar disorder, but none of the records provides a firm diagnosis. This record reflects that Dr. Callahan had only seen claimant two times before (and once after) filling out the form with conclusory findings.

In his opinion, the ALJ specifically identified the conclusory nature of Dr. Callahan's opinions, lack of support in the medical information of record, minimal treatment, and the failure of claimant to supplement the record.  The ALJ was thus free to discount the opinion of Dr. Callahan because, as the ALJ explained, her assessment was wholly conclusory, not supported by objective medical evidence, and inconsistent with the objective medical evidence of record (R. 15-19).

The court finds that good cause exists for the ALJ's discounting of Dr. Callahan's opinion and that he clearly articulated his reasons for doing so.  Thus, substantial evidence supports his rejection of Dr. Callahan's opinion.

**C. The ALJ properly considered claimant's obesity when determining her RFC.**

Additionally, the claimant argues that the ALJ failed to properly consider obesity and its exacerbating effects while determining her RFC.  Claimant points out that the ALJ must consider

the cumulative effects of obesity on her ability to perform work-related tasks.  *See* 20 C.F.R. pt.

404, subpt. P, app. 1 § 1.00Q.  Social Security Regulation 02-1p provides in part:

> Obesity can cause limitation of function. The functions likely to be limited depend on many factors, including where the excess weight is carried. An individual may have limitations in any of the exertional functions such as sitting, standing, walking, lifting, carrying, pushing, and pulling. It may also affect ability to do postural functions, such as climbing, balance, stooping, and crouching. The ability to manipulate may be affected by the presence of adipose (fatty) tissue in the hands and fingers. The ability to tolerate extreme heat, humidity, or hazards may also be affected.  The effects of obesity may not be obvious. [...] Obesity may also affect an individual's social functioning.  An assessment should also be made of the effect obesity has upon the individual's ability to perform routine movement and necessary physical activity within the work environment. Individuals with obesity may have problems with the ability to sustain a function over time. [Our] RFC assessments must consider an individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis. [...] In cases involving obesity, fatigue may affect the individual's physical and mental ability to sustain work activity. This may be particularly true in cases involving sleep apnea.  The combined effects of obesity with other impairments may be greater than might be expected without obesity. [...]

Claimant did not raise the issue of obesity until this appeal and did not provide any

evidence that obesity renders her disabled.  Despite the claimant's failure to raise the issue

of obesity, the ALJ took note of the claimant's "morbid obesity" at the hearing because it

was visually obvious, and he questioned claimant regarding her weight, her ability to use

her fingers and hands and her ability to get around. (R. 32-33).  The ALJ determined

obesity to be a severe impairment in the Step 2 analysis. (R. 14).  The ALJ specifically

stated, however, that none of the plaintiff's treating physicians who were aware of her

obesity had reported that she is unable to sustain physical exertion because of this

impairment. (R. 19).  In addition, the ALJ noted that obesity does not obviously impact the

claimant's daily activities. (R. 19).

26

The ALJ properly relied upon the evidence in record in determining that the plaintiff could perform a full range of work at all exertional levels. *See Rutherford v. Chater*, 399 F.3d 546, 552-53 (3d Cir. 2005) (concluding that the ALJ's reliance on the opinion of physician who was aware of claimant's obesity constituted a satisfactory consideration of that condition**).**  Therefore, the ALJ found that the claimant had not proven that her obesity was itself disabling or otherwise significantly affected her ability to work.

The court finds that substantial evidence supports the ALJ's conclusion regarding claimant's obesity and that he properly considered it when determining claimant's RFC.

## D. The ALJ properly addressed claimant's part-time work history in determining her RFC.

Claimant asserts that the ALJ improperly considered her part-time work history in determining that she should be capable of performing work on a full-time basis.  The Government responds that the ALJ only considered the claimant's part-time work history in determining the credibility of her subjective complaints.

The claimant correctly points out that the ability to perform work on a part-time basis, while not precluding a finding of disability at Step 5, also does not imply that an individual is *capable* of full-time work at the SGA level.  *See Kelly v. Apfel*, 185 F.3d 1211, 1214 (11th Cir. 1999).  However, the ability to perform work on a part-time basis also does not imply that an individual is *incapable* of full-time work at the SGA level. The court acknowledges that a hypothetical claimant could pass Step 5 and be entitled to benefits even though she is capable of working on a part-time basis. *See Kelly v. Apfel*, 185 F.3d at 1215.  Yet, claimant's ability to work part-time, while not determinative of her

27

ability to work full-time, is not irrelevant to a determination of claimant's credibility.

The ALJ merely mentioned the fact that claimant has worked on a part-time basis during the relevant time period to show that she has been capable of performing some type of work activity since the alleged onset date, because that work contradicted her own subjective characterization of her abilities. (R.19)   The ALJ underwent a "pain standard" analysis in his decision, because many of the claimant's alleged disabilities were subjective, such as the intensity of her headaches, and the limiting effects of her ADHD and anxiety.  The claimant does not challenge the ALJ's analysis under the pain standard and, thus, a full pain standard analysis by the court is not required.

The pain standard requires (1) evidence of an underlying medical condition and either (2) objective medical evidence that confirms the severity of the alleged pain arising from that condition or (3) that the objectively determined medical condition is of such a severity that it can be reasonably expected to give rise to such pain.  *Wilson v. Barnhart*, 284 F.3d 1219, 1225 (11th Cir. 2002).  This standard also applies to complaints of subjective conditions other than pain.  *Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991). Once an impairment is established, all evidence about the intensity, persistence, and functionally limiting effects of pain or other symptoms must be considered in addition to the objective medical evidence.  *Foote v. Chater*, 67 F.3d 1553, 1561 (11th Cir. 1995).  If the Commissioner decides not to credit such testimony, he must discredit it explicitly, and articulate explicit and adequate reasons for doing so.  *Brown v. Sullivan*, 921 F.2d 1233, 1236 (11th Cir. 1991).

In his analysis, the ALJ determined that the claimant's impairments could be

28

reasonably expected to cause the alleged symptoms, but that the claimant and her grandmother's statements concerning the intensity, persistence, and limiting effects of the symptoms were not credible. (R.18)  The ALJ afforded little weight to claimant's grandmother's Third Party Daily Activities Questionnaire, because it was inconsistent with the report from Three Springs. (R.19).  The ALJ also decided that claimant's testimony regarding her symptoms was not credible because she was able to work part-time after the alleged onset date of her disability, drive to her mother's home to visit with family members 3-4 times per week, and care for her personal needs. (R.19).  He also noted that claimant experienced significant improvement when she underwent counseling and took her medications as prescribed.  Thus, contrary to claimant's argument, the ALJ did not base his determination that claimant is able to perform full time work solely upon her part-time work history.  Instead, he pointed to her part-time work history as one of several facts contradicting her characterization of her symptoms and discrediting her subjective testimony.  That contradiction was appropriate to point out in a credibility analysis.

The court finds that the ALJ properly considered claimant's part time work in his pain standard analysis of her credibility.

## VII. CONCLUSION

For the reasons as stated, this court concludes that the decision of the Commissioner is supported by substantial evidence and is to be AFFIRMED.

A separate order will be entered in accordance with this Memorandum Opinion.

DONE and ORDERED this 26th day of September 2011.

KARON OWEN BOWDRE
UNITED STATES DISTRICT JUDGE